IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC., § | | |
| MERCURY GROUP, INC., HENRY § | | |
| MARTIN, WILLIAM WINKLER, § | | |
| MELANIE MONTGOMERY, AND JESSE § | | |
| GREENBERG, § | | |
|     *Movants*, § | Miscellaneous Case No. | |
| § | 3:20-mc-00021-G-BK | |
| § | | |
| § | Related Civ. Action No. 3:19-cv-02074-G | |
| v. § | (Northern District of Texas) | |
| § | | |
| NATIONAL RIFLE ASSOCIATION OF § | | |
| AMERICA and WAYNE LAPIERRE, § | | |
|     *Respondents*. | | |

### REPLY IN SUPPORT OF MOTION TO QUASH THIRD PARTY SUBPOENAS

Movants filed the Motion to Quash (the "***Motion***") Respondent's eight subpoenas on February 7, 2020 in the Western District of Oklahoma as the court where compliance was required.[1] Movants sought transfer of the Motion to this Court. Respondents agreed with the transfer. The Western District of Oklahoma transferred this Motion on February 25, 2020.

To quash a third-party subpoena, one must have a "personal right or privilege in the subject matter of the subpoena or a sufficient interest in it."[2] A personal right includes communications between the challenging party and the subpoenaed party, for example, as well as confidential business information.[3] The subpoenas at issue (the "***Oklahoma Subpoenas***") facially demonstrate that personal right when they request documents that AMc created—not just about AMc's services

---

[1] FED. R. CIV. P. 45(d)(3)(A).
[2] *Bramell v. Aspen Exploration, Inc.*, No. 4:05-CV-384, 2008 U.S. Dist. LEXIS 72674, at *4 (E.D. Tex. Sep. 23, 2008).
[3] *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-cv-2110-P, 2014 U.S. Dist. LEXIS 24995, at *7 (N.D. Tex. Feb. 27, 2014) (finding standing where subpoena sought communications between defendants and subpoenaed parties, and where subpoenas would "require the non-parties to disclose trade secrets and confidential information"). That court also reasoned that disclosure of sensitive business documents "is presumptively more harmful than disclosure to a noncompetitor." *Id.* at *12.

to the subpoenaed parties, but how AMc calculated its fair market value billing and "non-public" information like direct communications between AMc and the subpoenaed parties, for instance. Even the NRA argues that the documents will uncover AMc's alleged knowledge and prior business practices—*i.e.*, information it personally created or possessed (has a personal right in). And because the NRA is requesting documents AMc created or received, "it should not be necessary for Plaintiff to obtain copies of the documents from the non-parties," even if it were entitled to them.[4]

Despite attaching hundreds of unnecessary pages of documents,[5] the NRA has failed to rebut Movants' showing that the Oklahoma Subpoenas are overbroad, irrelevant, and harassing by seeking confidential, proprietary documents from numerous business relationships that ended years (and decades, for some) prior to this dispute and that have no relevance to any facts in the underlying litigation in Texas. Notably, the NRA relies on alleged information from third parties in support of its subpoena and Response while refusing to actually disclose that information or produce the alleged documents.[6]

The NRA spends most of its Response addressing AMc's work for other clients allegedly similar to the work it performed on NRATV, in addition to arguing that AMc opened itself up to this reputational discovery by alleging defamation.[7] The NRA and its lead counsel defamed AMc by accusing it of an extortion coup (in internal NRA communications and in the national press).

---

[4] *Id.* at *10-11.
[5] To illustrate, the NRA attached emails with subpoenaed third parties for the proposition that the Oklahoma Subpoenas are not problematic because some of those third parties willingly conferred with the NRA. Those other subpoenas are subject to motions to quash in two other jurisdictions. Moreover, the NRA only just disclosed to Movants in support of its Response that any third party produced any documents.
[6] *See* ECF 6 at 8 ("Factual Background") (claiming to have learned about AMc's "fraud" for which the subpoena is required based on "recently unearthed text messages and emails").
[7] ECF 3 at 18-19.

AMc's reputation for not being extortionists has no relation to NRATV, its billing, or its work for other clients. The NRA has failed to show otherwise.

Without repeating argument concerning the lack of relevance for each of the third parties, Movants specifically address the concerns raised in the Response about Senior Star, Greater Oklahoma City Chamber of Commerce, and Williams Energy Resources, LLC. Movants performed no services for Williams Energy Resources, LLC; the NRA has not demonstrated otherwise, and the entity appears to have confirmed the same in its emails with the NRA. As for the other two, AMc provided localized (Tulsa, Oklahoma) services mostly focusing on traditional advertising efforts (including, but not limited to, print magazines, logo design, website copy without actually handling the websites, and creation of video that the third party would upload to its own website). Notably, those two entities concern, respectively, a senior living residence and visitor information about Oklahoma (like lifestyle blog posts, what restaurants to visit, and where to live). Neither have a need for viewership analytics like NRATV, hoping to garner national (and international) support, as their audiences are rather finite, especially Senior Star who targets seniors in Tulsa. More importantly, AMc had no control over, and did not create, any digital media platform (as it did with NRATV), and it had no knowledge of how, or if, either entity was or is tracking or creating traffic.

As to overbreadth, the NRA requested from the eight third parties documents covering certain subject matters, which scope it then expanded by asking for documents *relating, concerning, and referring to* those subjects, *i.e.*, what in reality amounts to any document ever created bearing on those subjects—all documents created by or relating to AMc's services to those eight third parties. The NRA has not shown how these requests are "narrowly tailored" as represented. As the NRA's choice case explained, a court may find undue burden from a "facially

overbroad" subpoena, as here, requiring these third parties to reach back, in some cases, decades for documents wholly unrelated to this present dispute.[8]  And a court is not required to first modify a subpoena before quashing.[9]

| No. | Substance of Request | Overbreadth |
|---|---|---|
| 1 | Documents *concerning* the Digital Media programming and content or platform that AMc provided to You… | Documents "concerning" the programming and content or platform includes **all** documents ever created for the "Digital Media." |
| 2 | Documents *concerning* forecasts, predictions, or estimates… | Documents "concerning" these topics include **all** documents that pre- and post-date such forecasts, predictions, or estimates, including the underlying work upon which those forecasts are based. |
| 3 | Documents *concerning* the actual performance or success of the Digital Media content and platform… | Documents "concerning" the performance of the entire content and platform includes **all** documents underlying the work upon which the performance/success are based. |
| 4 | Documents *concerning* the Digital Media programming and content or platform that AMc provided to You | Documents "concerning" the programming and content or platform again includes **all** documents ever created for the "Digital Media" as with Request No. 1. |
| 6 | Documents that *relate to* the amount of money spent by You on the Digital Media content and platform. | Documents that "relate to" the money spent necessarily includes **all** documents underlying the money spent, *i.e.*, all the documents relating to the services performed—as opposed to documents that reflect the amount of money spent, *i.e.*, invoices already requested in Request No. 7. |
| 8 | Documents reflecting *any concerns* about or requests to AMc for information on [named content or platform] or Your Digital Media content and platform… | Documents that reflect "any concern" would include information unrelated to this dispute, even to the NRA's attenuated argument for the subpoena—*e.g.*, the "concern" about when a new segment will air on the named platform or the "concern" about whether the platform looks good on mobile as opposed to desktop format, neither of which have any relation to the NRA's claims for fraudulent billing and viewership analytics |
| 9 | Documents and communications, prepared by You, AMc, or Mercury, that *refer or relate to* the following projects: [named content or platform]. | As with Requests No. 1 and 4, documents that "refer or relate to" the content or platform includes **all** documents that in any way mention the project, including all documents from inception to cessation, which is grossly overbroad for any purpose in the litigation. |

---

[8] *See Wiwa v. Royal Dutch Shell Petroleum, Co.*, 392 F.3d 812, 818 (5th Cir. 2004).  Also note that, of the eight subpoenas, all but three include Request No. 9 listed in the table.
[9] *See Tiberi v. Cigna Ins. Co.*, 40 F.3d 110, 112 & fn.4 (5th Cir. 1994) ("The choice to quash or modify is discretionary in the district court.").

Although the NRA argues the subpoena can be modified to a relevant timeframe, it failed to argue *at all* how documents <u>more than</u> 10 years old (*e.g.*, documents back to inception of some business relationships that began in 2002 or 2004) are relevant to the platform of NRATV, let alone how to limit the subpoena.[10]

Additionally troublesome is the NRA's reliance on its own allegations and "beliefs" rather than any supporting evidence. When claiming "no one watched NRATV's live broadcasting feed," the NRA cites to its own First Amended Complaint.[11] The NRA also argued that it "believes that many, if not all, of the prior digital media campaigns that AMc used to induce the NRA to invest in the creation of NRATV were failures."[12] But subjective belief is not the proper standard for determining whether the NRA *first* had a good faith basis in law and fact for asserting a claim to warrant a third-party subpoena. We can believe pigs fly, but that does not permit us to subpoena the farmer and all his co-op members for all information about their pigs.

Case in point, the NRA says in its Response and Complaint "many, if not all" of the prior AMc clients had failed media campaigns without ever once saying which clients or providing any support.[13] The NRA also alleges in its Response and Complaint that, "[j]ust like NRATV, those digital media campaigns were shut down because of their general ineffectiveness…."[14] But, again, the NRA never once mentions who "those" "failed" clients are, other than allegedly American Clean Skies Foundation, addressed below. The reason? Because this is a fishing expedition. That improper motive is exposed when considering (1) the NRA subpoenaed third parties who were

---

[10] In the case the NRA relies upon for the contention that this Court may modify the subpoena, (1) the Court used the party's own temporal limitation for the modification, and (2) the Court modified the subpoena to avoid delay because it was unable to determine the basis for the lower court's ruling in quashing the subpoena and whether there was error, not just because it thought the subpoena was worthy of modification. *See Wiwa*, 392 F.3d at 821 & n.45.
[11] ECF 6 at 9.
[12] *Id.* at 17.
[13] ECF 6 at 17.
[14] *Id.*

*never* AMc clients—demonstrating the NRA does not even know who the clients are, let alone that their AMc media campaigns were unsuccessful; and (2) the NRA allegedly wants information about "failed" campaigns that were "shut down," yet it subpoenaed AMc's *current* clients (necessarily showing no failed campaign and no "shut down")—like the Chamber of Commerce. Typically, this ancillary discovery history is irrelevant, but here the abuse through these subpoenas and in the four lawsuits against AMc is necessary to understand the NRA's gamesmanship.

Further, the NRA misrepresents to this Court the parties' understanding, agreement, and business practice concerning what analytics would be (and were) provided. In fact, at no point in this litigation, in the three lawsuits the NRA lodged against AMc in Virginia, or in either discovery process has it ever defined "unique" viewership or indicated how the agreed-upon numbers AMc provided (for years) of completed, engaged, and total views were insufficient. What the NRA purports to "reasonably" request here does not exist because the NRA never requested such metrics at the time and, indeed, such measurement was impossible: one cannot count whether person A is watching NRATV content across multiple platforms (website, Facebook, etc.) and devices. And for those clients who received traditional advertising services—not digital and not an owned media platform—this argument even further exposes the farcical basis for the subpoenas.

The NRA then cites to a deposition from a former employee of American Clean Skies Foundation ("*ACSF*") to propose that his testimony is proof AMc charged "steep costs that were not recoverable" and refused "to respond to questions and requests for information on budgets and operations."[15] Several issues: (1) ACSF has no relation to the Oklahoma Subpoenas; (2) that individual had no degree or prior experience with accounting for proper budgeting practices; and

---

[15] ECF 6 at 19-20.

(3) the ACSF creator and its Board repeatedly approved the AMc budgets and work performed. The employee also testified that all of the bills issued by AMc were in fact paid by ACSF.

The NRA also relies on offensive use of the attorney-client privilege in support of its arguments, which is the subject of pending disputes before this Court. In its responses to Defendants' motions to quash, the NRA accused AMc of "obstructing its investigation" by "attempt[ing] extortion and an unsuccessful coup"[16] to justify why it needed to seek discovery from these third parties. But this argument is disingenuous for two reasons. First, the evidence baldly demonstrates the opposite, as discovered through deposition testimony from NRA high-ranking officials and other employees. Second, the extortion narrative was planted by the NRA's counsel in the first place, yet the NRA continues to assert privilege over the *underlying fact* (read: non-privileged) of who first claimed attempted extortion.[17] Using the attorney-client privilege to *create* a narrative and then *shield* the facts surrounding its creation is impermissible "sword-and-shield" abuse of the privilege and an improper basis for granting the NRA its overreaching subpoenas.

Beyond these reasons, the NRA also has an ulterior motive for seeking the documents. On the one hand, the NRA concedes, in different verbiage, that it wants to use this information to show AMc acted in conformity with prior bad acts. On the other hand, the NRA's lead counsel is using these subpoenas to circumvent the protective order it seeks to unwind in those three Virginia lawsuits, which extends to the Texas federal dispute. That order prohibits the NRA's lead counsel from accessing, reviewing, or using AMc's Highly Confidential information. But if the NRA could obtain those documents in the Texas federal case through a third party *first*, AMc's only

---

[16] *See e.g.*, ECF 6 to *Ackerman McQueen, Inc., et al. v. NRA, et al.*, Miscellaneous Case No. MC-20-1-HE (W.D. Okla.) (opened in the Northern District of Texas as Case No. 3:20-mc-00481) at 8.
[17] *See e.g.*, ECF 55 at fn.20.

opportunity to designate the information Highly Confidential would be *after* the NRA already has an opportunity to review and use the documents. And any potential claw-back remedy requires unfounded reliance on the NRA and its counsel complying therewith. Not to mention, the NRA opposes Movants' requests to apply the same two-tier confidentiality protective order from Virginia in the Texas matter, which is also the subject of a pending motion. The fact that AMc just learned through the NRA's Response that some third parties have produced documents proves this risk to be real and imminent. In fact, now that Senior Star has produced documents to the NRA—as disclosed through the NRA's Response—to the extent AMc had any documents to designate Highly Confidential, the NRA just succeeded in circumventing the protective order.

As set forth by *Wiwa*, the Oklahoma Subpoenas (1) seek information not relevant to the dispute in the lawsuit, which (2) exposes the lack of the NRA's need for such documents; (3) the subpoenas are facially and practically overbroad, exacerbated by (4) an attenuated time period extending *beyond* 10 years in several instances; (5) the subpoenas lack particularity when they seek *all* documents between AMc and the third parties relating to AMc's services; and (6) the overbreadth alone demonstrates undue burden, which all factors together further emphasize.[18]

## CONCLUSION

For the foregoing reasons, Movants respectfully request this Court grant their Motion; quash the Oklahoma Subpoenas; transfer the Motion to the Northern District of Texas; and grant Movants any further relief, at law or in equity, to which they may be justly entitled.

---

[18] 392 F.3d at 818.

Dated: March 11, 2020.

Respectfully submitted,

*/s/ Brian E. Mason*
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR MOVANTS ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, JESSE GREENBERG, WILLIAM WINKLER, AND MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas. I hereby certify that I have served the document on counsel for the NRA the issuing court in the Northern District of Texas, Dallas Division.

*/s/ Brian E. Mason*
BRIAN E. MASON